IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION


PENNIE ROSS,

     Plaintiff,

v.                                No. 1:12-cv-01269-JDB-egb

FLUID ROUTING SOLUTIONS, INC.,

     Defendant.

_____

ORDER DENYING PLAINTIFF'S REQUEST THAT THE COURT DISREGARD PORTIONS
OF RANDY GOOD'S AFFIDAVIT;
SUSTAINING DEFENDANT'S OBJECTION TO THE ADMISSIBILITY OF EVIDENCE
REGARDING OTHER ACTS OF DISCRIMINATION; AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

       Plaintiff, Pennie Ross, a Tennessee resident, filed this diversity lawsuit against her former

employer, Defendant, Fluid Routing Solutions, Inc. ("FRS" or "the Company"), a Delaware

corporation, on November 20, 2012, alleging gender discrimination and retaliation under the

Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401 *et seq.* (the "THRA"); violation of

the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 (the "TPPA"); and common-

law retaliatory discharge.  Before the Court is FRS's motion, pursuant to Rule 56 of the Federal

Rules of Civil Procedure, for summary judgment as to all of Plaintiff's claims.  (D.E. 41.)  Ross

responded[1] and the Defendant filed a reply.

---

[1]     The Court notes that Plaintiff's response (D.E. 65) in opposition to FRS's motion for summary judgment
utilizes a 0.75-inch margin on the left side, a 0.71-inch margin on the right side, 11-point font size, and Arial Narrow
font.  This violates Local Rule 7.1, which requires that all papers presented for filing be in 12-point font size with
one-inch margins on all sides, and Electronic Case Filing Procedure A.2, which prohibits use of any font other than
Times New Roman, Arial, and Courier New.  L.R. 7.1(a)-(b), Local Rules of the U.S. Dist. Ct. for the W. Dist. of
Tenn.; Procedure A.2, Electronic Case Filing Policies and Procedures Manual for the U.S. Dist. Ct. for the W. Dist.
of Tenn.  The Court has admonished Plaintiff's counsel on a prior occasion for noncompliance with these formatting

# I.  BACKGROUND[2]

FRS is an automotive parts manufacturer.  (Pennie Ross Dep. 32:22–33:1, D.E. 43-1.) Ross began working for a predecessor of Defendant in 1988 as a production employee at the company's Lexington, Tennessee manufacturing facility.  (Def.'s Stmt. of Material Facts ¶ 1, D.E. 43-9; Compl. ¶ 6, D.E. 1.)  In 2004, she served as the interim human resources ("HR") director for the Lexington plant, which was by then under the ownership of FRS, after which, in 2005, she became full-time HR manager.  (Def.'s Stmt. of Material Facts ¶ 2, D.E. 43-9.)  In 2009, FRS hired Tim Parys as the division manager over the Lexington facility, in which capacity he served as Ross's immediate supervisor.  (Id. ¶ 3.)

Among Ross's responsibilities as HR manager was advising the Company regarding compliance with state and federal employment laws.  (Id. ¶ 4.)  Also, in this role, she served as an intermediary for employee complaints and concerns, including ones about race and gender discrimination and harassment, which, if serious enough to necessitate an investigation, she required be put in writing.  (Id. ¶ 5.)  Her lawsuit alleges retaliation for various actions she took and/or statements she made while performing these duties.  (Compl. ¶ 30, D.E. 1.)

---

specifications.  Should Plaintiff's counsel repeat one or more of these failures to comply in connection with any future filing, whether in this case or another, such filing will be *sua sponte* stricken from the record.

[2]      Unless otherwise indicated, the facts herein are taken from the complaint (D.E. 1), FRS's Statement of Undisputed Material Facts (D.E. 43-9), the Plaintiff's response thereto (D.E. 65-1), and related exhibits.  Plaintiff has submitted her own "Statement of Disputed Material Facts" for the Court to consider in deciding this motion. (*See* D.E. 78.)  However, of these purportedly "disputed" material facts, the Court declines to consider paragraphs 1–11, 13–39, and 44 due to noncompliance with the Local Rules.  Local Rule 56.1(b) allows a nonmoving party, such as Ross, to file a "statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried," but requires that the statement of facts be "concise," and that "each . . . disputed fact be set forth in a separate numbered paragraph with citations to the record supporting the contention that such fact is in dispute."  L.R. 56.1(b), Local Rules of the U.S. Dist. Ct. for the W. Dist. of Tenn.  Paragraphs 15 and 44, which contain lengthy factual narratives, do not meet the conciseness requirement of this Local Rule and are for that reason rejected.  As to the remainder of the numbered paragraphs listed above, Ross has identified portions of the record that support the *veracity* of the particular fact stated in the paragraph while failing to cite any proof supporting a contention that the fact is *in dispute*.  In essence, Ross has filed a statement of facts for the Court to consider, not for their controverted nature, but, to the contrary, for their truth value.  As Ross has failed to cite any proof that the matters she presents are disputed, and as neither the Federal Rules of Civil Procedure nor the Local Rules contemplate the filing by a nonmovant of a statement of *un*disputed facts, the Court has disregarded all offending paragraphs.

In or around February 2009, FRS laid off and gave a severance package to a focus factory manager named Craig Phillips. (Def.'s Stmt. of Material Facts ¶ 7, D.E. 43-9; Craig Phillips Dep. 19:10–24, D.E. 43-4.) When Parys decided to rehire Phillips in October 2009, (Phillips Dep. 13:25–14:5, D.E. 43-4), Ross questioned the decision, telling Parys she knew of three non-management-level female employees, Jennifer Lipford, Donna Ivey, and Rhonda Burton, who had also been laid off with severance packages but were not being rehired. (Def.'s Stmt. of Material Facts ¶ 8, D.E. 43-9.) She did not insist that Parys rehire these women; rather, she simply inquired why they could not also be hired back. (Id. ¶ 9; Ross Dep. 175:24–176:14, D.E. 43-1.) She informed Parys that when Phillips worked at the plant before, there had been some complaints from female employees that he spoke to and/or scolded them unfairly harshly regarding their work performances. (Ross Dep. 154:14–24, D.E. 43-1.) Plaintiff did not record in writing her concern about Phillips's rehire nor did she discuss it with anyone other than Parys. (Def.'s Stmt. of Material Facts ¶ 10, D.E. 43-9.) She testified at her deposition that although she did not believe it was illegal for FRS to rehire Phillips while not the three female employees, she felt doing so would "open up a big can of worms." (Id. ¶ 11; Ross Dep. 172:10–17, D.E. 43-1.) Ultimately, at Ross's suggestion, one of the three females, Burton, applied for a temporary position at the Lexington plant, was rehired, and later transferred to full-time status. (Ross Dep. 172:2–9; 176:15–25, D.E. 43-1.)

During a plant-wide layoff in 2005, the Company gave senior male employees in "extrusion" positions the opportunity to transfer to "pin and pull" jobs held by less senior employees. (Def.'s Stmt. of Material Facts ¶ 35, D.E. 43-9.) Some female extrusion workers also wanted the opportunity to try the pin-and-pull position in lieu of being laid off, but Phillips would not allow this as he did not believe that a woman would be physically able to perform the

job.  (Id. ¶ 36.)  Although Ross felt that fairness dictated laying off the male extrusion workers the same as the females, she did not believe it illegal for FRS to instead transfer the men into the pin-and-pull positions.  (Id. ¶ 37; Ross Dep. 188:6–16, D.E. 43-1.)

In March 2010, Judith Belew, an employee who had accrued eight absences and signed a letter of commitment promising not to miss any more days, called Ross from an emergency room where she was seeking treatment for a serious medical condition to say that she would not be at work and intended to file an application for FMLA leave.  (Def.'s Stmt. of Material Facts ¶ 17, D.E. 43-9; Ross Dep. 113:18–25; 116:1–4, D.E. 43-1.)  Plaintiff believed that Belew was eligible for FMLA and stated as much when she relayed Belew's phone call to Parys.  (Ross Dep. 115:2–6, D.E. 43-1.)  He disagreed and instructed Ross to "[not] allow [Belew] to turn in FMLA [paperwork]" because she was to be terminated for excessive absenteeism.  Plaintiff, concerned that Belew might sue and ultimately prevail in a lawsuit against the Company, advised Parys against this course of action.  (Id. at 119:12–16.)  When Parys did not relent, Ross followed his instruction and told Belew she was being terminated.  (Id. at 119:18–20; 122:17–22.)  Plaintiff also signed a Tennessee Department of Labor ("TDOL") Separation Notice certifying excessive absenteeism as the reason for Belew's firing.  (Def.'s Stmt. of Material Facts ¶ 20, D.E. 43-9.)  However, she expressed to Benefits Manager Christine Mallory, who worked at the Company's corporate office, that she believed Belew was entitled to FMLA leave, should not have been discharged, and might "sue us or something."  (Ross Dep. 116:5–14, D.E. 43-1.)  She expressed similar sentiments to Phillips, who was Belew's supervisor.  (Def.'s Stmt. of Material Facts ¶ 19, D.E. 43-9.)

In May 2010, Ross learned that the Company was considering rehiring a former male employee name Charles Wheeler, whom it had previously terminated for poor job performance.

(Ross Dep. 189: 10–14; 192:19–25, D.E. 43-1.)  She discussed the matter with both Phillips and Parys and advised Parys not to bring Wheeler back because of his prior performance issues.  (Id. at 189:15–190:11; 192:19–193:2.)  However, Phillips, whose idea it had been to consider rehiring the former employee, believed that he "would be better this time around."  (Id. at 193:19–2.)  Ultimately, Wheeler was rehired into a "team leader" position on May 19, 2010.  (Def.'s Stmt. of Material Facts ¶ 38, D.E. 43-9; Ross Dep. 192:2–8, D.E. 43-1.)  Although Plaintiff felt this decision was unfair because FRS "never hired any females back," she did not believe it was illegal and did not complain about it to anyone other than Parys.  (Def.'s Stmt. of Material Facts ¶¶ 38–39, D.E. 43-9; Ross Dep. 190:12–18, D.E. 43-1.)

On November 1, 2010, FRS terminated employee Kenneth Hudson after he violated company policy by failing to properly clock in and out of work on one occasion.  (Def.'s Stmt. of Material Facts ¶ 21, D.E. 43-9; Ross Dep. 125:3–14; 126:25–127:1, D.E. 43-1.)  Although Plaintiff agreed terminating Hudson was "probably the best thing for the company," she told Parys and Thrasher she thought that because of Hudson's race (African-American) and his worker's compensation history, it would be illegal to do so.  (Def.'s Stmt. of Material Facts ¶ 22, D.E. 43-9.)  She also questioned the fairness of the decision in light of the fact that other employees "who ha[d] trouble clocking in [were] give[n] . . . the benefit of the doubt."  (Id. ¶ 23; Ross Dep. 127:3–6, 18–25; 128:1, D.E. 43-1.)  She reminded Parys that a white female purchasing representative named Crystal Carnal had been clocking herself in and out of work from her home computer, without repercussions.  (Def.'s Stmt. of Material Facts ¶ 23, D.E. 43-9.)  Again, however, Parys did not heed Ross's advice and instead, at the recommendation of manager Travis Thrasher, decided to discharge Hudson.  (Ross Dep. 128:20–129:3, D.E. 43-1.)  Plaintiff signed a TDOL Separation Notice certifying that the reason for Hudson's termination

was violation of company policy. (Id. at 130:19–133:3.)  As far as she can recall, she did not discuss this situation with anyone other than Thrasher and Parys. (Id. at 128:15–17; 129:4–17.) Further, although Ross believed Parys was allowing Carnal to violate the Company's timekeeping policy, she did not report it to any other member of management. (Def.'s Stmt. of Material Facts ¶ 25, D.E. 43-9.)

Sometime prior to Parys's arrival in 2009, Phillips instructed Plaintiff not to post a job opening for a supervisory position because an African-American employee named Felix Tuggles would qualify for and likely get the job. (Id. ¶ 40.)  Tuggles was one of the employees whom, in 2005, the Company permitted to transfer to a pin-and-pull position to avoid being laid off. (Ross Dep. 208:3–5, D.E. 43-1.)  According to Ross, Phillips thought Tuggles was "too weak" for the supervisory job and, although never explicitly indicating that Tuggles's race was a factor, referred to him to the effect of being a "lazy black guy" and stated that the Company "should have fired the nigger when [it] had the chance" in 2005. (Id. at 208:14–16, 19–21; 209:6–24; 211:2–21, D.E. 43-1.)  Ross did not report the use of this racial slur but did speak to manager Russell Williams—Parys's predecessor—about Phillips's directive that she not post the job opening. (Id. at 213:3–8; Def.'s Stmt. of Material Facts ¶ 41, D.E. 43-9.)  Williams advised her that she "should not have to post [the opening]" anyways because Tuggles would "automatically move back to that position." (Ross Dep. 213:9–12, D.E. 43-1.)  This prediction proved correct as Tuggles was ultimately transferred into the position in question. (Id. at 213:13–18.) Subsequently, and most recently in November 2010, Ross complained to Phillips, Mallory, and later Parys that Tuggles was paid less than white supervisors. (Def.'s Stmt. of Material Facts ¶¶ 42–43, D.E. 43-9.)

Sometime after Parys joined the Company, Phillips asked Ross not to post a line-attendant job opening because a female employee named Marketa Staten would qualify for the job. (Id. ¶ 26.) Phillips never stated that it was because of her race that he did not want Staten, who is African-American, in the position. (Id. ¶ 27.) Although Phillips did not explicitly say as much, Plaintiff believed that he was concerned Staten would use the fact that she had a prior worker's compensation injury as an excuse to frequently "miss work." (Id. ¶ 28; Ross Dep. 145:24–146:1, D.E. 43-1.) Ross posted the job despite Phillips's request, and Staten was promoted to the position on August 10, 2009. (Def.'s Stmt. of Material Facts ¶ 29, D.E. 43-9.) Plaintiff never reported to anyone that Phillips had not wanted Staten for the job. (Id. ¶ 30.)

On several occasions throughout her tenure as HR manager, Plaintiff complained to FRS management that female employees at the Lexington plant were receiving lower pay than their male counterparts. Specifically, she talked to Parys and Mallory sometime shortly after Parys arrived in 2009 about the pay rates of Logistics Manager Barbara Reszel and Quality Engineer Starla Wolfe. (Id. ¶¶ 46–47.) Although, according to her, Parys "just sort of blew [these complaints off]" and she believed there was gender discrimination at play, Ross never elevated her concerns to his superiors. (Ross Dep. 231: 2–18; 232:6–10, D.E. 43-1.) A number of times, and as recently as in 2010, Plaintiff complained to Williams, Quality Manager Tony Corley, Parys, and Mallory, that a female quality technician named Jamie Goff was paid two dollars less an hour than a male employee who performed a similar job. (Def.'s Stmt. of Material Facts ¶ 44, D.E. 43-9). Goff and her counterpart had different job classifications, but, according to Plaintiff, their jobs were "pretty much the same" and Goff had been performing work outside her job classification. (Id. ¶ 45; Ross Dep. 219:8–25, D.E. 43-1.) According to Ross, Corley felt that Goff did not deserve a pay increase because she had "a bad attitude." (Ross Dep. 220:8–10, D.E.

43-1.) None of the members of management with whom Plaintiff discussed Goff's situation ever expressed that Goff's pay was not being increased because she was a female. (Id. at 220:11–221:1.) Still, the fact that Goff made less money than her male coworker when the two "were working side-by-side," was, in Ross's mind, unfair and potentially "illegal." (Id. at 221:2–6.) In addition, Ross claims that she also complained once about her own pay to Williams in 2002 or 2003 and later to Parys soon after he started in 2009. (Id. at 222:4–6; 238:8–25; 241:23–242:1.)

Plaintiff contends that a few months before she was terminated, Parys and Corley informed her they wanted to demote Starla Wolfe to an hourly position because they were concerned she could not perform her job due to a vision impairment. (Def.'s Stmt. of Material Facts ¶ 49, D.E. 43-9; Ross Dep. 244:7–9, D.E. 43-1.) In response, Ross told them that she "just was not going to move [Wolfe] to an hourly rate of pay" and explained that Wolfe could continue to perform in her position if she were accommodated with a larger computer screen and a magnifying glass. (Def.'s Stmt. of Material Facts ¶ 50, D.E. 43-9; Ross Dep. 245:18–246:5, D.E. 43-1.) Following this conversation, Corley "changed his mind," provided Wolfe the accommodation Plaintiff had suggested, and did not pursue the demotion. (Def.'s Stmt. of Material Facts ¶ 51, D.E. 43-9.)

In April or May 2012, Parys and Barbara Reszel approached Ross and asked her to increase the salary of Nick Smith, a customer service representative who had threatened to quit if he did not make more money. (Id. ¶ 53.) Plaintiff told them that increasing Smith's pay rate was unfair because he had only been working at the Company for a short time and would then be making more money than Christy Wyatt, a customer service representative for more than twenty years. (Id. ¶ 54.) Neither Reszel nor Parys pursued the issue any further, and Smith did not

receive a pay increase but was instead transferred to another position. (Id. ¶ 55; Ross Dep. 234:9–12, D.E. 43-1.)

In support of her gender-discrimination claim, Ross contends, *inter alia*, that, as her supervisor, Parys on multiple occasions singled her out and counseled her for being late to meetings but did not subject her male counterparts to the same scrutiny when they failed to show up on time. (Def.'s Stmt. of Material Facts ¶ 56, D.E. 43-9.) She admits that she was sometimes tardy for meetings but was never formally "written up" for this. (Id. ¶ 57.)

Parys testified at his deposition that, about a year after he took over at the Lexington plant, he began having concerns about Plaintiff's job performance. (Parys Dep. 117:5–2, D.E. 43-2.) In February 2011, he completed a performance appraisal of her in which he indicated she needed improvement in several position objectives and competencies. (Def.'s Stmt. of Material Facts ¶ 62, D.E. 43-9.) In his deposition testimony, Parys characterized this review as "failing." (Id. ¶ 63.) On the performance appraisal form where he documented his review, he noted that Ross had been asked to take over management of the plant safety program, but the program had not reached its intended results. (Id. ¶ 64.) He observed that she failed to meet expectations with regard to scheduling events—particularly communications meetings—and that she needed to improve on the task of filling skilled and professional positions. (Id. ¶ 65.) He further wrote that Plaintiff needed to work on her professionalism, with specific emphasis on her time-management and delegation skills. (Id. ¶ 66.) He also commented that she struggled with confidence and self-esteem and needed to improve her display of knowledge. (Id. ¶ 67.)

Additionally, Parys testified that there were other issues with Plaintiff's performance, including that employees were abusing and/or misusing intermittent FMLA leave under her watch. He felt her background and experience "limited her" as HR chief because she came into

the position after climbing the ranks at the Lexington plant with only "in-house training" and no "formal HR training." (Id. ¶¶ 59, 61; Parys Dep. 133:17–23, D.E. 43-2.) Although Parys mistakenly believed otherwise, Ross in fact has a bachelor's degree in organizational management. (Parys Dep. 136:11–17, D.E. 43-2; Ross Dep. 15:12–15, D.E. 43-1.)

Following the resignation of the HR manager at FRS's Southfield, Michigan facility in late 2011 or early 2012, Parys, CEO Mike Laisure, and CFO John Carson began discussing options to consolidate the Company's HR operations in anticipation of the Company's looming acquisition by Park-Ohio Industries, Inc. (Def.'s Stmt. of Material Facts ¶ 68, D.E. 43-9.) They decided to eliminate the HR position in Southfield and shift the divisional responsibilities of that position to a plant-based HR manager. (Id. ¶ 69.) These responsibilities included recruitment of salaried employees, tracking of HR measurables, and coordination of HR procedures. (Id. ¶ 70.) It was further decided that the individual in this redeveloped HR manager role should be based in Lexington, as it is the largest of the Company's facilities, and report to both Parys and Laisure. (Id. ¶¶ 71–72.) Parys testified in his deposition that, in considering this new position, he felt it was important not only to improve the performance of the current HR manager, but to make sure the individual in that role could handle the changes in the position. (Id. ¶ 74.) He stated that, based on his concerns about Ross's performance, he did not believe she was capable of performing the expanded HR manager position, and recommended to Laisure that she be discharged from employment. (Id. ¶¶ 73, 75.) Plaintiff was terminated on June 1, 2012. (Id. ¶ 75.)

As Ross's replacement, Parys selected an individual named Randy Good, whom he had identified through a professional recruiter. (Id. ¶ 76.) Among Good's relevant qualifications and experience were a bachelor's degree in human resources management; a Senior Professional

Human Resources ("SPHR") certification; a stint as instructor of an SPHR preparation course for other HR professionals; U.S. Air Force-acquired leadership training and training on how to investigate complaints of sexual harassment and discrimination; and prior tenures as HR manager at four different companies, most of which were engaged in manufacturing. (Id. ¶¶ 78–81.) Parys offered Good the position via letter dated May 2, 2012, stating:

> Along with responsibility for directing the human resources department in Lexington, this position may also include providing human resource assistance to other FRS locations as directed. In this position, you will report to the Extrusion Group President, Tim Parys, with dotted line reporting to Mike Laisure CEO for divisional support requirements.

(Id. ¶ 82.) Good accepted, and within his first ninety days at the Company, he had assumed oversight of six FRS facilities as well as responsibility for corporate-wide reporting and recruiting. (Id. ¶ 83.) He currently manages 1,374 FRS employees nationwide. (Id. ¶ 84.)

As of the last day of her employment at FRS, Ross was in charge of overseeing 365 employees at the Lexington plant. (Id. ¶ 6.) However, during her tenure as HR manager there, she had also been tasked with some "multi-plant responsibilities," which were outside the scope of her role at the Lexington plant, including matters that required her assistance at the Company's Ocala, Florida facility. (*See* Ross Personnel File, D.E. 65-16 at 27, 30, 42 & 43.)

Ross maintains that the true reasons Defendant discharged her were her gender and the fact that she had complained of, spoken out about, and refused to participate in "illegal activity," including gender, race, and disability discrimination, and violations of FMLA. (Compl. ¶ 30, D.E. 1.) As such, she claims her termination violated the THRA and TPPA and constituted retaliatory discharge under Tennessee common law. (Id.) She further contends that FRS violated the THRA even before discharging her when, on these same unlawful bases, it subjected her to increased scrutiny, gave her negative performance reviews, refused to increase her pay,

prevented open dialogue between her and management, and/or took other adverse actions against her. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 11–12, 17–18, D.E. 65.)

On Plaintiff's retaliation claims under the THRA, TPPA and Tennessee common law, FRS insists it is entitled to summary judgment because Ross, acting purely within her role as HR manager, did not engage in any protected activity; there is no evidence of a causal connection; and, even if she could make out a prima facie case of any of these causes of action, she cannot rebut the Company's legitimate, non-retaliatory reasons for acting as it did. (Mem. in Supp. of Def.'s Mot. for Summ. J. 14–19, 22–24, D.E. 43-8.) In addition, Defendant contends that Ross failed to meet her prima facie burden as to her gender-discrimination claim because, regarding her termination, she was not qualified for the expanded HR manager position. (Id. at 19–20.) According to FRS, the Company had this and other legitimate, nondiscriminatory reasons for replacing her, which she cannot refute; and, concerning the various other adverse actions she has identified as discriminatory, she cannot point to any male who was both similarly situated and treated more favorably relative to her. (Id. at 19–21; Def.'s Reply 8–11, D.E. 73.)

## II. STANDARD OF REVIEW

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1988). A dispute about a material fact is genuine only if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the moving party satisfies its initial burden, "the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." Slusher v. Carson, 540 F.3d, 449, 453 (6th Cir.

2008).  In reviewing a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor."  <u>Smith v. Perkins Bd. of Educ.</u>, 708 F.3d 821, 825 (6th Cir. 2013)(quoting <u>Slusher</u>, 540 F.3d at 453); *see* <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Thus, summary judgment is warranted, following discovery and proper motion, against a party who fails to make a sufficient showing to demonstrate the existence of an element essential to her case and on which she will bear the burden at trial.  <u>Celotex</u>, 477 U.S. at 322–23, 106 S. Ct. at 2552.

## III. ANALYSIS

A.    Plaintiff's Request that the Court Disregard Portions of Good's Affidavit

As a preliminary matter, the Court will address Ross's request that the Court decline to consider certain statements in the affidavit of Randy Good, submitted by Defendant in support of summary judgment as D.E. 43-3, to the extent they differ from Good's deposition answers to questions covering the same subject matter.  (*See* Pl.'s Resp. to Def.'s Stmt. of Undisputed Material Facts ¶¶ 68, 71, 84, D.E. 65-1.)  Although she does not refer to it by name, it would appear Plaintiff's contention is based on the well-established prohibition against submission at the summary-judgment stage of what have been termed "sham issues of fact."  This rule was set forth in <u>Reid v. Sears, Roebuck & Co.</u>, 790 F.2d 453 (6th Cir. 1986), in which the Sixth Circuit Court of Appeals held that "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  <u>Id.</u> at 460.  The court went on to observe that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a

procedure for screening out sham issues of fact." Id. In a later opinion, the Sixth Circuit noted that

> [t]he rule set forth in Reid is grounded in the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. Reid and its progeny have thus barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony.

Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907 (6th Cir. 2006), reh'g denied (Jun. 20, 2006).

Thus, the issue in Reid was exactly the opposite of that presented here. The case clearly dealt with a nonmovant's attempt to create an issue of material fact in response to a motion for summary judgment, not a movant's attempt to establish the absence of disputed facts in favor of a motion for summary judgment. This Court is not aware of any case applying the Reid rule to a situation such as that at bar. In any event, the Court finds that the purported inconsistencies identified by Ross are in fact not. The Plaintiff's request is therefore DENIED.

B.      Defendant's Objection to Evidence of "Other Acts" of Gender Discrimination

Also, at the outset, the Court considers Defendant's position that the deposition testimonies of several of Ross's coworkers, which she contends are "highly probative of the gender discrimination that is rampant at the FRS Lexington plant," (see Pl.'s Mem. in Opp'n to Mot. for Summ. J. 26, D.E. 65), should be rejected as inadmissible evidence. FRS contends that this testimony is irrelevant under Rule 401 of the Federal Rules of Evidence and, under Rule 403, that the risk that this evidence would cause unfair prejudice and confusion if it were to be admitted is too substantial to allow it. (Def.'s Reply 9–10, D.E. 73.)

Whether this type of "other acts" evidence is relevant in any given case "'depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and

theory of the case.'" Griffin v. Finkbeiner, 689 F.3d 584, 598 (6th Cir. 2012)(quoting

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388, 128 S. Ct. 1140, 1147, 170 L. Ed.

2d 1 (2008)). The Sixth Circuit has warned district courts against focusing only on whether the

same individual or supervisor took each alleged discriminatory employment action. Id. at 598–

99. Instead, the court should also consider other potentially relevant factors including "temporal

and geographical proximity, whether the various decisionmakers knew of the other decisions,

whether the employees were similarly situated in relevant respects, or the nature of each

employee's allegations of retaliation," and whether the evidence is "logically or reasonably tied

to the decision made with respect to" the plaintiff. Id.; *see also* Bennett v. Nucor Corp., 656 F.3d

802, 809–10 (8th Cir. 2011)(approving the district court's approach of evaluating whether each

incident involved "the same place, the same time, the same decision makers, or whether it's such

that the people who are making the decisions reasonably should have known about the [alleged

discriminatory acts]" (quotation marks omitted)), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1807,

182 L. Ed. 2d 619 (2012); ___ U.S. ___, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (2012).

Considering all pertinent factors, the Court must exclude as irrelevant the "other acts" of

discrimination that Plaintiff offers to support her disparate-treatment claim. To begin, Ross has

made the Court's task here difficult because she has not identified the particular relevance of

these non-party employees' allegations, other than to generically assert that "[t]estimony by

other employees regarding the circumstances of their discharge may be relevant as evidence of

motive and intent," and that statistics of other discriminatory acts "are relevant evidence because

they support the claim that the employer's decision was pretextual." (Pl.'s Mem. in Opp'n to

Mot. for Summ. J. 22, D.E. 65 (citations, internal quotation marks and alterations omitted).)

However, assuming she offers these other acts as evidence of intent, for purposes of her showing

of pretext, the Court's inquiry must focus on how closely related these other allegations are to the nature and circumstances of her termination-based assertion of gender discrimination alone, since, as set forth below in part III.D of this opinion, the Court concludes that she has not made a proper prima facie showing as to any of the other employment actions she alleges were discriminatory. With respect to the allegations of employees Susan Davidson and Jamie Goff concerning disparate pay, there is no indication that the individual deciding their pay rates was the same alleged bad actor (Parys) perpetrating discrimination against Ross, nor, at least as to Davidson, is the Court able to discern whether the alleged pay discrimination occurred at a similar time as Ross's discharge. *Cf.* Reed v. Proctor & Gamble Mfg. Co., 927 F. Supp. 2d 508, 528 (W.D. Tenn. 2013)("Without [] details [such as the timing and circumstances of the incidents he mentions], the Court is poorly situated to engage in a fact-bound determination of whether the 'other acts' evidence is even relevant to Plaintiff's claims."), *aff'd sub nom.* Reed v. Procter & Gamble Mfg. Co., ___ F. App'x ___, 2014 WL 553000 (6th Cir. Feb. 13, 2014). There is also no evidence that either of these women were similarly situated to Plaintiff. Further, the only similarities between Lisa Hannah's situation of being demoted from focus factory manager to shipping and receiving supervisor and the disparate treatment alleged by Plaintiff is that Parys was a common decisionmaker and both she and Plaintiff were replaced by males. Again, there is no showing that Hannah and Ross were similarly situated to one another. Regarding the alleged demotion of Wanda Muse out of the quality manager position, which was then filled by a male (Corley), there are no apparent commonalities between this event and any of Ross's allegations, other than again the fact they were both replaced by men.

The common denominator among all of these women, including Plaintiff, is a subjective belief that each has been discriminated against based on her gender. However, the experiences

of Plaintiff and these other, non-party employees are simply too distinct for the "other acts" to have any relevancy to her claim. *Cf.* <u>Schrack v. RNL Carriers, Inc.</u>, ___ F. App'x ___, 2014 WL 1717021, at *5 (6th Cir. May 2, 2014)(rejecting other employees' testimony of prior bad acts where the alleged bad actors were different; the allegations were "too vague and conclusory" to determine if the nature of the claims was similar, and the employees were not similarly situated to the plaintiff); <u>Megivern v. Glacier Hills Inc.</u>, 519 F. App'x 385, 400–01 (6th Cir. 2013)(where all of the non-party employees whom plaintiff identified as having been subjected to pregnancy discrimination by the defendant "present[ed] factually distinct circumstances from [plaintiff's] case," their affidavits did not support a finding of pretext). FRS's objection to this evidence is therefore SUSTAINED.

C.      THRA Retaliation

The THRA prohibits an employer from "[r]etaliat[ing] . . . in any manner against a person because such person has opposed a practice declared discriminatory by [the statute] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under" the THRA. Tenn. Code Ann. § 4-21-301(1). In enacting the THRA, the Tennessee legislature "intended to further the policies" of Title VII and, therefore, courts interpreting the THRA "may appropriately look to decisions of federal courts construing Title VII when analyzing claims under" the state statute. <u>Payne v. Goodman Mfg. Co.</u>, 726 F. Supp. 2d 891, 903 (E.D. Tenn. 2010).

To establish a prima facie case of retaliation, a plaintiff must prove that

(1) she engaged in activity protected by [the THRA]; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action.

Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009)(Title VII), *reh'g denied* (Mar. 27, 2009); *accord* Ayala v. Summit Constructors, Inc., 788 F. Supp. 2d 703, 715 (M.D. Tenn. 2011)(THRA). The plaintiff's burden in establishing a prima facie case is not an onerous one. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008). Where only circumstantial evidence supports the plaintiff's claim, the burden then shifts to the defendant to provide a nondiscriminatory basis for the adverse employment action. Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007), *reh'g denied* (May 16, 2007). Once the defendant has made this showing, the plaintiff may avoid summary judgment by demonstrating that the proffered reason was pretextual. Id.

Ross maintains in this action that FRS retaliated against her for engaging in the following activities, which she asserts were protected under the THRA: (1) complaining to Parys that her own salary was less than males; (2) opposing the rehire of Phillips because of his "former harassment" of female employees; (3) raising concern that three females who had, like Phillips, signed severance agreements were, unlike him, not being rehired; (4) "[finding] a new way to get" one of these three females, Rhonda Burton, rehired; (5) opposing the rehire of Wheeler in light of the fact that former female employees who had been laid off were not being asked to come back; (6) complaining about Phillips not wanting her to post a line-attendant job opening because Staten, a black female, would qualify for it; (7) posting this job opening, despite Phillips's instruction; (8) complaining about the pay rate of Tuggles relative to that of white supervisors; (9) increasing Tuggles's pay rate without approval; (10) reporting to Phillips's supervisor that he had ordered her not to post a supervisory job opening because he was afraid Tuggles would get the job; (11) posting this job opening, contrary to Phillips's directive (12) complaining about Hudson's termination, which she believed was based on his race; (13)

pointing out that certain female employees were being paid less than their male counterparts; (14) objecting to management's intent to raise the pay rate of Nicholas Smith above that of a female who had been in the same position for twenty years; (15) refusing to increase Smith's pay; (16) complaining about disability discrimination concerning management's plan to move Wolfe down to an hourly position due to her vision impairment; (17) refusing to demote Wolfe; and (18) raising Wolfe's pay rate without approval. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 9–10, D.E. 65.)

Several of these alleged protected activities can be disregarded at the outset because they are not supported by the record, particularly Plaintiff's own testimony. First, the various prior "complaints" raised by female employees to Ross about Phillips, of which Plaintiff made Parys aware when he was considering rehiring Phillips, were not, as Plaintiff characterizes them in her response brief, complaints of "harassment" in the legal sense. She admitted at her deposition that she had never received any complaints about Phillips relating to "harass[ment] . . . on the basis of a protected characteristic" and that instead the matters that had been previously reported, of which she advised Parys, concerned Phillips's "harsh" manner of speaking to employees regarding their work performances. (Ross Dep. 162:22–163:18, D.E. 43-1.) Complaints of this nature are not within the scope of the THRA. *Cf.* Manstra v. Norfolk S. Corp., No. 3:10-CV-166, 2012 WL 1059950, at *11 (E.D. Tenn. Mar. 28, 2012)("While plaintiff may have complained and reported that her supervisors were acting unfairly or harshly, this type of complaint does not constitute protected activity about matters made unlawful by Title VII or the THRA."). Second, according to Plaintiff's deposition testimony, the opposition she expressed to management as to the rehiring of Wheeler concerned his previous "performance issues," not the fact that laid-off female employees were not also offered an opportunity to return. (Ross Dep.

189:15–190:11; 192:19–193:2, D.E. 43-1)  Even if the latter was a matter of concern for her, she does not testify that she brought it to the attention of management.  Third, Plaintiff admitted at her deposition that she never complained to anyone that Phillips had not wanted Staten for the line-attendant job, and, as such, any claim based on such a complaint is untenable.  (Id. at 143:6–12; 254:10–20.)  Fourth, Ross testified at her deposition that when she raised the pay rates of both Tuggles and Wolfe, it was in 2008, prior to Parys's arrival, and at the instruction of former Plant Manager Russell Williams, who "told [her] to get [the pay increases] put through the system."  (Id. at 205:13–207:7.)  Thus, contrary to her assertion in her response brief, she did not make these pay adjustments "without approval" of management; rather, she acted in accordance with a command from her supervisor.  Finally, there is no evidence that Ross, in defiance of Phillips's order, actually posted the job opening regarding the supervisory position for which Tuggles would qualifiy.  Instead, Plaintiff testified that when she went to Williams to discuss the matter, he advised her there was no need to post the opening as Tuggles would "automatically" be transferred into the position.  (Id. at 213:9–12.)

Additionally, the Court rejects both of the alleged protected activities that relate to a proposed pay raise for Nicholas Smith as they took place *after* Parys had already decided to terminate Plaintiff (and after the last-cited incident of any of the other alleged adverse actions).  Ross admits that Parys began seeking candidates to replace her as HR manager in February 2012.  (*See* Pl.'s Stmt. of Disputed Material Facts ¶ 33, D.E. 78.)  Further, it is undisputed that it was in April or May 2012 that Reszel and Parys first approached Plaintiff about increasing Smith's pay.  (*See* Pl.'s Resp. to Def.'s Stmt. of Undisputed Material Facts ¶ 53, D.E. 65-1; Ross Dep. 234:13–235:16, D.E. 43-1.)  Ross cannot credibly claim she was retaliated against for activity in which, as of the date of the alleged retaliatory acts, she had not yet even engaged.  *Cf.* Reynolds v.

Extendicare Health Servs., Inc., 257 F. App'x 914, 920 (6th Cir. 2007)("it is not appropriate to view placing Reynolds on the PIP as being causally related to her filing of the complaint because the PIP decision had been made prior to the protected action").

To establish that she has engaged in THRA-protected opposing activity under the first prima facie element, a plaintiff "must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of" the anti-discrimination statutes, Barrett, 556 F.3d at 516; the absence of such a showing here requires the Court to eliminate three more of Plaintiff's alleged protected activities. Regarding the Company's decision to rehire Phillips, despite the fact that he signed a severance agreement, while refusing to do the same for three former female employees in similar predicaments, there is no evidence that Ross opposed these choices based on a belief that they violated the THRA or any other law. In fact, she testified that she did not believe what happened was illegal, but that she was concerned it would "open up a big can of worms." (Ross Dep. 171:18–22; 172:10–17, D.E. 43-1.) Plaintiff has not demonstrated, thus, that to the extent she "opposed" FRS's failure to rehire the three females as it had Phillips, her opposition was based on some belief—much less a *reasonable* one—that unlawful discrimination was at play. *Cf.* Thomas v. Ohio Civil Rights Comm'n, No. 2:04-CV-0944, 2006 WL 1697577, at *9 (S.D. Ohio June 20, 2006)("Complaining vaguely about not getting a raise, promotion, or bonus, absent an accompanying specific complaint of illegal discriminatory conduct, does not constitute protected activity."). In turn, she also has not shown that her (ultimately successful) effort to get Burton employed again at the Company, despite that initial setback, was in resistance of perceived discrimination. Likewise, there is no indication that Ross's refusal to honor Phillips's request to not post the line-attendant job opening was based on a good-faith belief that this violated the THRA. Rather, Plaintiff

testified that she believed the reason Phillips did not want Staten in the position was a fear that she would use her prior worker's compensation injury as an excuse to be absent from work, (Ross Dep. 145:24–146:1, D.E. 43-1), and "[f]iling a worker's compensation claim is not 'oppos[ing] a practice declared discriminatory' by the THRA." Brown v. Delek U.S. Holdings, Inc., No. 3:09-0179, 2009 WL 4884442, at *4 (M.D. Tenn. Dec. 10, 2009)(quoting Tenn. Code Ann. § 4–21–301). To the extent Ross believed that Staten's race was an additional matter of concern to Phillips, she has put forth no evidence to support this or from which can be inferred a reasonable basis for such a belief. Cf. Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 F. App'x 651, 654 (6th Cir. 2012)(finding no protected activity where "[n]othing in [plaintiff's] responses [to statements by her executive] can reasonably be construed as 'opposition' to the alleged racial character of the statements"). Because Plaintiff has not shown that in these instances she was acting in opposition to what she reasonably perceived to be unlawful discrimination, she cannot rely on them as a basis for her retaliation claim.

Of the remaining alleged protected activities, Defendant contends that to the extent they consist of Ross raising complaints about or advising management regarding the Company's potential violations of the law, they were part of her regular job duties as HR manager and are therefore insufficient to invoke the protection of the THRA. (Mem. in Supp. of Def.'s Mot. for Summ. J. 16, D.E. 43-8.) In doing so, it urges the Court to apply the so-called "scope of employment rule" or "manager rule," which requires that, in order to have engaged in protected activity, human resources officials or other managers involved in employee relations must, when speaking up about or advising the employer regarding potential discrimination and other personnel or ordinary human-resources matters, step outside his or her normal employment role to do so. As Defendant notes, this rule, which has long been recognized in other circuits, was

adopted fairly recently by the Sixth Circuit in the context of a Fair Labor Standards Act ("FLSA") case, Pettit v. Steppingstone, Center for the Potentially Gifted, 429 F. App'x 524, 530 n.2 (6th Cir. 2011). Applying the rule in Pettit, the court held that the plaintiff's complaints concerning her employer's compliance with the FLSA, made while in the course of performing job duties assigned to her as director of human resources, were, to the extent undertaken to protect the employer's interests, not protected activity for purposes of an FLSA retaliation claim. Pettit, 429 F. App'x at 530. Although the court there was not called upon to decide whether the manager's rule also applies to Title VII (or THRA) claims, it did cite, as an example of where one of the other circuits had "conclud[ed] that complaints within the scope of one's job duties cannot be protected activity," the case of EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998), where the Eighth Circuit employed the rule in analyzing Title VII and Missouri Human Rights Act retaliation claims of a personnel director against his employer. *See* Pettit, 429 F. App'x at 530 n.2.

Ross has taken the position that the manager's rule must not be expanded beyond the FLSA context because, unlike the FLSA, Title VII and the THRA recognize not only participation, but also opposition, as a form of protected activity and, as such, protect a much broader universe of conduct than does the FLSA. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 4–7, D.E. 65.) The Defendant insists that this distinction is immaterial for present purposes because it has been the practice of courts, including the Sixth Circuit, to broadly interpret FLSA's retaliation provision to include the type of internal, informal complaints that fall under Title VII's opposition clause and which are alleged here. (Def.'s Reply 3 n.4, D.E. 73.) The Court need not resolve this particular dispute, however, because it finds that, in a case cited by neither party, the Sixth Circuit has in fact rejected the substance of the manager's rule in the Title

VII context, explaining that it "runs counter to the broad approach used when considering a claim for retaliation under [the opposition clause], as well as the spirit and purpose behind Title VII as a broad remedial scheme." Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000), *cert. denied*, 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 560 (2000).

In Johnson v. University of Cincinnati, the court reversed the district court's holding that the plaintiff, who was vice president and a high-level affirmative-action officer at a university, did not engage in protected activity under Title VII's retaliation provision by, as part of his job, advocating for women and minorities in opposition to the school's alleged unlawful and discriminatory employment practices. 215 F.3d at 579–81. The appellate court explained that "the fact that Plaintiff may have had a contractual duty to voice such concerns is of no consequence to his claim" because, as to an employee's right to invoke "protection from retaliation under Title VII's opposition clause . . . there is no qualification on who the individual doing the complaining may be" nor that the discrimination of which the individual complains be against him or herself. Id. at 580. It went on to state:

> [T]he district court allows for an employer to retaliate against the person best able to oppose the employer's discriminatory practices—the "high-level affirmative action official"—without fear of reprisal under Title VII. Indeed, the individual who has contracted to advocate on behalf of women and minorities has not thereby contracted to be retaliated against for his advocacy.

Id.

To apply the manager's rule in this case, just as in Johnson, "would be to invite stratagems designed to circumvent, and indeed, to violate law which was designed to serve 'as a spur or catalyst to cause employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.'" Id. at 577 (quoting United

Steelworkers v. Kaiser Aluminum & Chem. Corp., 443 U.S. 193, 204, 99 S. Ct. 2721, 2728, 61 L. Ed. 2d 480 (1979))(internal quotation marks omitted). Indeed, the Sixth Circuit has indicated the Johnson holding is not limited solely to claims brought by affirmative-action officers, concluding in Warren v. Ohio Department of Public Safety, 24 F. App'x 259 (6th Cir. 2001), that an HR director's Title VII retaliation claim against her employer was not defeated simply because she may have had "'a contractual duty to voice [concerns over unlawful discriminatory acts].'" Id. at 265 (quoting Johnson, 215 F.3d at 579–80.) Considering these cases, the Court declines to adopt the manager's rule here to preclude Ross's THRA retaliation claim based on complaints she may have made in the course of her ordinary job responsibilities.

Nevertheless, none of the remaining alleged protected activities can support a claim of retaliation because Plaintiff has not shown, as required under the fourth element of her prima facie case, a causal nexus between these activities and any adverse action. Ross has pointed to three actions of the Defendant that she contends were retaliatory: (1) increased scrutiny of her job performance; (2) the negative performance evaluation Parys completed of her in February 2011; (3) and her June 1, 2012 termination. In assessing the causation element here, the Court considers only the latter two of these actions as Plaintiff has not provided citations to any record evidence that supports her allegation of increased scrutiny.[3]

To establish a causal connection between the protected activities and either her termination or the negative performance review, Plaintiff must proffer "'evidence sufficient to

---

[3]     The fact of Parys's negative performance assessment(s) in and of themselves do not show that Plaintiff was subjected to any *increased* scrutiny. To the extent she intended to offer Parys's informal, oral reprimands regarding her tardiness to meetings as examples of "increased scrutiny," these do not amount to an adverse employment action. There is no indication their impact on Ross was any greater than *de minimis*. *See* Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000)("The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable."). As such, they would not have persuaded a reasonable worker from bringing a charge of discrimination. *Cf.* Taylor v. Geithner, 703 F.3d 328, 338 (6th Cir. 2013)(finding no adverse employment action where plaintiff had not shown that a disciplinary action had been taken or that the reprimand "related to a larger pattern of intimidation by constantly reprimanding [plaintiff]").

raise the inference that her protected activity was the likely reason for the adverse action.'" Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 675 (6th Cir. 2013)(quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009)), *reh'g denied* (Apr. 12, 2013).  Temporal proximity "always plays a role in establishing a causal connection," but ordinarily it is insufficient alone to establish such a connection.  Id. at 674.  "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Mickey, 516 F.3d at 525.

Plaintiff cannot rely on temporal proximity to prove causal connection with regard to the alleged protected activities that occurred in or prior to 2009 because she has failed to bring forward evidence from which the Court can approximate the dates of these occurrences. Concerning her complaint to Williams about Phillips instructing her not to post the supervisory job opening for fear it might go to Tuggles, she only states that this occurred "after the big layoff" in 2005 and "when [Williams] was there," which the Court presumes means prior to Parys's arrival, which, according to his testimony, was sometime in 2009.  (Ross Dep. 208:1–5; 213:3–6, D.E. 43-1; Parys Dep. 30:4–9, D.E. 43-2.)  As to the conversations she had with Parys about the pay rates of Reszel, Wolfe, and herself relative to similarly situated males, she assigns no more specific a date than "shortly after [Parys] arrived in Lexington."  (Ross Dep. 241:15– 242:1, D.E. 43-1.)  If Ross is to rely on temporal proximity to establish a causal connection between these incidents and the alleged retaliatory acts for purposes of her prima facie case, she must meet her burden of demonstrating this proximity by a preponderance of the evidence. Nicholson v. City of Clarksville, Tenn., 530 F. App'x 434, 448 (6th Cir. 2013)(citing Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013)).  Absent a more specific estimation of the timing of

these events, she has not satisfied that burden. *See* id. at 447–48 (where the plaintiff merely stated that he engaged in the protected activity "sometime in 2008" and did not produce any other evidence further approximating the date, he could not "establish a prima facie case of retaliation with respect to" this activity); Lahar v. Oakland Cnty., No. 05-72920, 2007 WL 2752350, at *10 (E.D. Mich. Sept. 21, 2007)(finding that plaintiff failed to show causal connection by temporal proximity where "the timing of the alleged [adverse action was] unclear as she only assert[ed] that it was sometime in 2003"), *aff'd*, 304 F. App'x 354 (6th Cir. 2008).

Furthermore, even if the Court were to presume that Plaintiff raised these complaints on the latest possible date in the year 2009, they were too far removed from any retaliatory conduct to justify a time-derived inference of causal causation; more than a year would have passed before she received the negative performance assessment, and at least two and one-half years before she was terminated. *See* Dixon, 481 F.3d at 334 (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001))("[T]he Supreme Court held that a finding of causal connection was not warranted where, among other things, almost two years elapsed between the employee's participation in protected activity and the adverse employment decision."); Jones v. St. Jude Med. S.C., Inc., 823 F. Supp. 2d 699, 749 (S.D. Ohio 2011)("because more than a year elapsed between the time when Plaintiff filed this lawsuit in November of 2008 and her termination in December of 2009, Plaintiff cannot show causation on the basis of temporal proximity"), *aff'd*, 504 F. App'x 473 (6th Cir. 2012); Crum v. Tyson Fresh Meats, 390 F. Supp. 2d 658, 673 (M.D. Tenn. 2005)("Crum cannot take advantage of any presumption based upon temporal proximity because the last event of which he complained occurred more than a year before his termination.").

Even though the protected activities in which Plaintiff allegedly engaged in 2010—complaining about the pay rates of Goff (on an unspecified date that year) and Tuggles (in November 2010), and opposing Hudson's termination (also in November 2010) —may have occurred only a few short months before her February 2011 performance appraisal, this does not without more satisfy the causation prong. *See* <u>Lahar v. Oakland Cnty.</u>, 304 F. App'x 354, 359 (6th Cir. 2008)(holding that a five-month period of time between protected activity and alleged retaliation could not alone support an inference of causation); <u>Hafford v. Seidner</u>, 183 F.3d 506, 515 (6th Cir. 1999)(concluding that, "[a]bsent additional evidence, the "loose temporal proximity" of "two to five months" was "insufficient to create a triable issue" as to the causation prong); <u>Cooper v. City of N. Olmsted</u>, 795 F.2d 1265, 1272–73 (6th Cir. 1986)(finding a four-month gap insufficient)). Ross contends, however, that there was a "series of events" following her engagement in these protected activities, which, when viewed as a whole, constitute additional evidence of Defendant's retaliatory motive. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 13–15, D.E. 65.) These alleged events were occasions in which, according to Plaintiff, Parys "just blew [her] off," (Ross Dep. 217:5–12, D.E. 43-1), "sort of didn't listen to [her]," (<u>id</u>. at 243:16–20), and sometime in 2010 rated her as "needs improvement" on an informal performance review, (Parys Dep. 124:23–125:2, D.E. 43-2).[4] (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 13, D.E. 65.)

In the cases to which Ross cites as support for her "series of events" argument, the additional retaliatory conduct, which in conjunction with temporal proximity was found sufficient to justify an inference of causation, consisted of multiple, specific incidents in which

---

[4] Although in her response brief Plaintiff also mentions that Parys "made her feel as she was in trouble," "made her feel as she was about to lose her job," and "beat her down," (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 13, D.E. 65), these assertions do not warrant consideration because the Court finds they all are mischaracterizations of and/or are not supported by the cited portions of her deposition testimony.

the plaintiff-employee was directly targeted with negative treatment. For instance, in <u>Little v.</u> <u>BP Exploration & Oil Co.</u>, 265 F.3d 357 (6th Cir. 2001), after the plaintiff filed two EEOC complaints, management instructed his coworkers to make false allegations against him, and he was severely and formally disciplined for a dress-code violation for which other employees were not similarly castigated. <u>Id.</u> at 365. In <u>Moore v. Kuka Welding Systems & Robot Corp.</u>, 171 F.3d 1073 (6th Cir. 1999), there was some evidence that, very shortly after the plaintiff filed an EEOC complaint, management told his coworkers "not to talk to him, go into his area, or otherwise interact with him," and he was subjected to "more frequent disciplinary writeups . . . for trivial matters and unwarranted criticism of [his] work." <u>Id.</u> at 1078, 1080.

In contrast, however, the additional evidence that Ross advances in this case to supplement her showing of temporal proximity is quite tenuous. When testifying, rather nebulously, about how Parys ignored her and/or disregarded her opinions, Plaintiff implied that he treated her in this manner from the very beginning of his time at Lexington. (*See* Ross Dep. 204:16–23 (in reference to an incident she pinpointed as having occurred in the time "since [Parys] got [to the Lexington plant]": "[Parys] didn't talk to me a whole lot. So I didn't want to push my luck with him."); 231:2–8 (testifying that "shortly after [Parys] came to Lexington," he "just sort of blew . . . off" an issue she raised concerning a particular pay discrepancy), D.E. 43-1.) Additionally, with respect to the informal review in which Parys rated Ross's performance as "needing improvement," the only evidence before the Court as to the timing of this is Parys's deposition testimony recalling that the year was 2010. (Parys Dep. 124:23–125:2, D.E. 43-2.) Hence, this incident may very well have preceded any alleged protected activity that year. Even assuming, however, that it occurred after Plaintiff raised her complaints in 2010, Ross fails to "identify any aspects of [the review], other than [its] timing, that would suggest that [it was]

motivated by a desire to retaliate against [her]," Evans v. Prospect Airport Services, Inc., 286 F.

App'x 889, 896 (6th Cir. 2008).  *See* id. at 895–86 (determining that, where the plaintiff merely

contested the validity of certain disciplinary actions that were taken against her without

otherwise linking these actions to retaliatory animus, their alleged lack of justification was not an

"incidi[um] of retaliatory conduct" such as was found in Little and Moore).  Plaintiff's

unsupported characterization of Parys's actions as retaliatory is simply insufficient as a matter of

law to permit an inference of causation.  *See* id. at 896 (concluding that the plaintiff failed to

meet his burden of proving causal connection where  "rather than setting forth specific facts

which would justify an inference of causation, [he] has only offered unsupported allegations that

he was retaliated against on account of his filing of EEOC complaints").

Finally, as to Ross's alleged opposition to the idea of reassigning Starla Wolfe to an

hourly position, she has failed once again to supply evidence from which can reasonably be

approximated the date that this took place.  At her deposition, Plaintiff first testified that her

conversation with Corley and Parys concerning this potential demotion occurred "three or four

months before [Ross] was terminated," but then corrected herself, recalling that "[i]t probably

was longer than that."  (Ross Dep. 244: 7–9, D.E. 43-1.)  With no more precise an indication

than this as to timing, Ross cannot rely on a temporal-proximity argument to establish the

requisite causal nexus between her opposition to the Wolfe matter and her termination.

Moreover, any inference that the Company's decision to fire Ross was based on a desire to

retaliate against her for this particular opposition would be belied by the fact that, after Ross

allegedly expressed her concern that moving Wolfe to an hourly position might constitute

disability discrimination and advised Parys that the vision impairment could be accommodated in

her current position, he "changed his mind" in heed of her advice and abandoned the idea to

transfer Wolfe, deciding instead to accommodate her impairment so that she could remain where she was. *See* <u>Moore v. Freeman</u>, 355 F.3d 558, 562–63 (6th Cir. 2004)(noting in an FLSA case that the fact that the employer corrected the complained-of illegality before the plaintiff's discharge was relevant to whether the complaint was actually the cause of the firing). Here, again, Ross has not put forth sufficient evidence from which a jury could reasonably determine causation.

In sum, viewing the evidence in a light most favorable to Plaintiff, the Court finds that she has not demonstrated the existence of any triable issue of fact linking an adverse employment action—either the negative performance appraisal or her discharge—to her engagement in any THRA-protected activity. Accordingly, she fails to make a prima facie showing of retaliation under the statute. As a result, FRS's motion for summary judgment is GRANTED as to this cause of action.[5]

D. Gender Discrimination

To establish a prima facie case of gender discrimination under the THRA, Plaintiff must show "(1) she was a member of a protected class; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) a similarly situated non-protected employee was treated more favorably or she was replaced by someone outside the protected class." *See* <u>Neview v. D.O.C. Optics Corp.</u>, 382 F. App'x 451, 457 (6th Cir. 2010)(citations omitted). Once the plaintiff demonstrates a prima facie case of discrimination, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory

---

[5]     Based on the Court's conclusion that Ross failed to establish a prima facie case of retaliation under the THRA, it need not address the remainder of the <u>McDonnell Douglas</u>/<u>Burdine</u> analysis with respect to that claim. *See* <u>JAT, Inc. v. Nat'l City Bank of the Midwest</u>, No. 06–11937, 2008 WL 2397657, at *11 (E.D. Mich. June 10, 2008) ("Plaintiffs cannot establish a prima facie case for any of their discrimination claims. Accordingly, it is not necessary for the Court to engage in the remainder of the <u>McDonnell Douglas</u>/<u>Burdine</u> analysis.").

explanation for its actions; finally, if the defendant meets this burden, the plaintiff bears the burden of establishing that the proffered reason was pretextual. Id.

Ross alleges the following five actions on the part of the Company were materially adverse for purposes of her gender-discrimination claim: (1) paying her less than males in equivalent positions; (2) subjecting her to negative performance reviews; (3) treating her with a "lack of []respect"; (4) subjecting her to heightened scrutiny; and (5) terminating her employment. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 17–18, D.E. 65.) As determined in the context of Ross's retaliation claim, she cannot proceed on a claim based on heightened job scrutiny because she has not pointed to any evidence in the record that supports such an allegation other than perhaps the fact that Parys counseled her when she was late to meetings, which, as earlier determined, could have had no greater than a *de minimis* impact on her.

Plaintiff's allegation that she was treated with a "lack of respect," which the Court presumes is in reference to her assertions that she was ignored, disregarded, and/or not afforded appropriate attention by members of management, cannot form a basis of her gender-discrimination claim because this conduct neither individually nor collectively constitutes an adverse employment action for purposes of the second prima facie element. An adverse employment action in this context "is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008)(citation and internal quotation marks omitted), *cert. denied*, 556 U.S. 1235, 129 S. Ct. 2380, 173 L. Ed. 2d 1293 (2009). There is no indication that the alleged "lack of respect" constituted (or caused her to suffer) a significant change in employment status or benefits. Indeed, "[n]ot everything that

makes an employee unhappy is an adverse employment action." Stone v. Bd. of Dirs. of the Tenn. Valley Auth., 35 F. App'x 193, 200 (6th Cir. 2002). Ross has not pointed to any evidence showing that she suffered anything more than a subjective feeling of being slighted. Accordingly, Ross cannot proceed with a claim based on this assertion. *Cf.* King v. Louisiana, 294 F. App'x 77, 85 (5th Cir. 2008)(holding that employee's allegations of unpleasant work meetings, verbal reprimands, and a "change in attitude toward her" did not constitute adverse employment actions as discrimination or retaliation), *cert. denied*, 129 S. Ct. 2053, 129 S. Ct. 2053, 174 L. Ed. 2d 607 (2009); Anderson v. Clovis Mun. Sch., 265 F. App'x 699, 705 (10th Cir. 2008)(finding that the general level of disrespect and harsh treatment to which principal subjected the plaintiff-employee, even as evidenced by numerous unpleasant interactions between the two, did not amount to an adverse employment action for purposes of Title race-discrimination claim).

Ross's claim regarding her performance assessments also fails at the prima facie stage. Under the fourth prong,[6] a plaintiff must show "that [she] and [her] proposed comparators were similar in all relevant respects." Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012). "Factors to consider include whether the individuals 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Arnold v. City of Columbus, 515 F. App'x 524, 532 (6th Cir. 2013)(alteration in original)(quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)), *cert. denied*, ___ U.S. ___, 134 S. Ct. 532, 187 L. Ed. 2d 370 (2013). Although in her response brief, she asserts that "male managers were not . . . subjected to negative performance

---

[6]     As Defendant does not contest the third prong with respect to this allegation, the Court will assume for purposes of its analysis that the negative performance review constituted an adverse employment action.

reviews" like she was, (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 18, D.E. 65), and that in fact "she was the only employee that [sic] [Parys] gave a failing evaluation" in 2011, (id. at 14), she does not identify any particular individuals with whose treatment hers may be compared. Without more, the Court does not have the ability to assess whether any of these males occupied positions similar to HR manager, also reported to Parys as supervisor, were held to the same standards as Ross, or engaged in conduct similar to hers. The fact that male employees did not receive failing performance reviews is, standing alone, not sufficient to support an inference of discrimination. Because Plaintiff has not demonstrated that similarly situated employees outside her protected class were treated differently with respect to performance reviews, she has not met her burden under the fourth element. *Cf.* Manstra, 2012 WL 1059950 at *9 ("While plaintiff has alleged, throughout her statement of facts, that males were allowed to do things she was not, that in the opinions of several of her co-workers, males were treated better, and that Stigall and Morris treated her [more] harshly than they treated males, plaintiff has failed to describe which males enjoyed more favorable treatment, whether these males occupied the same position as plaintiff, or whether they received similar counseling and performance reviews. These conclusory allegations, in lieu of a similarly situated analysis, do not demonstrate that employees not within plaintiff's protected class were treated differently.").

With respect to Plaintiff's allegation of pay disparity, under the fourth prong of her prima facie case, she offers as comparators Thrasher, Phillips, and Corley, each of whom she asserts was in the same pay grade as she and received a higher salary. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 18, D.E. 65.) As determined by the Sixth Circuit,

> [t]he[] factors . . . relevan[t] to the inquiry of whether employees are similarly situated for purposes of resolving a gender-based wage discrimination claim under Title VII . . . include those aspects of the employment situation which must be examined in determining whether the plaintiff and a male employee performed

> "equal work" as that term is defined for purposes of the Equal Pay Act. Thus, the relevant factors include the skill, effort, and responsibilities of each job and the working conditions under which each job is performed.

Conti v. Universal Enters., Inc., 50 F. App'x 690, 699 (6th Cir. 2002). As Defendant points out, "[t]here is no evidence to suggest that all employees within the same pay grade performed the same type of work." (Def.'s Reply 8, D.E. 73.) Indeed, each of these men performed an ostensibly different role from Plaintiff, and Ross has not advanced any proof that the skills, effort, and responsibilities associated with these positions were similar to those required of her as HR manager. She has therefore not shown that Thrasher, Phillips, or Corley is similarly situated to her for purposes of her claim based on discriminatory pay. *Cf.* Hatchett v. Potluck Enters., Inc., No. 3:09-CV-00680, 2011 WL 902007, at *8 (M.D. Tenn. Mar. 11, 2011)("Plaintiff has not provided the Court with job descriptions or other evidence of the duties and responsibilities of [the] nominally different position[ occupied by the proffered comparator] that would allow a fact-finder to determine that [it was] essentially the same.")

Ross also names Good as a similarly situated male who is now paid more than she was. FRS insists that Good is not an appropriate comparator, however, because he was hired "with the expectation that he would take on more responsibilities than Plaintiff ever assumed, including oversight of six facilities and company-wide reporting and recruiting responsibilities." (Def.'s Reply 8–9, D.E. 73.) Although Ross presents some evidence that she too was engaged in "multi-plant" tasks while nominally serving as the Lexington HR manager, she has not demonstrated that these included company-wide reporting and recruitment nor that they required her to actually *oversee* multiple facilities at once. As she has failed to establish the requisite similarity between herself and Good under the fourth element, she cannot proceed with a claim based on the fact that he received a higher pay.

Her termination-based claim fares somewhat better, at least at the prima facie stage. The only element that Defendant contests with respect to this claim is the third: the requirement that Plaintiff be qualified for the position. To establish this element, a plaintiff need only demonstrate that he or she possessed the objective qualifications for the position. Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir. 2003). In determining whether the plaintiff was qualified, the court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action as this would bypass the pretext analysis. Id. at 574. Instead, the court should consider "the plaintiff's education, experience in the relevant industry and demonstrated possession of the required general skills." Id. at 576. FRS contends that Ross was qualified neither for her then-existing position nor the restructured position, which was to include considerably more responsibilities, because her job performance was already regarded as "failing." (Mem. in Supp. of Def.'s Mot. for Summ. J. 20, D.E. 43-8.) This, however, being the very purported nondiscriminatory reason provided by Defendant for its decision to discharge Plaintiff, cannot be considered at this juncture.[7] *See* Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660–61 (6th Cir. 2000)(stating that a court must examine plaintiff's prima facie evidence that she was qualified for the position independently of

---

[7]    The Court acknowledges that in concluding the Plaintiff failed to satisfy her burden to prove she and Good were similarly situated for purposes of her disparate-pay assertion, it considered evidence that Good's job responsibilities differ from the duties Ross performed while HR manager, which proof simultaneously supports Defendant's preferred nondiscriminatory reason for acting. However, as the Sixth Circuit itself has noted, "[Sixth Circuit] cases often incorporate an employer's nondiscriminatory reason for the adverse employment action in assessing a plaintiff's showing of the fourth element of a prima facie case." Wagner v. Matsushita Elec. Components Corp. of Am., 93 F. App'x 714, 717 (6th Cir. 2004)(citing Clayton v. Meijer, Inc., 281 F.3d 605, 610–12 (6th Cir. 2002)(considering whether plaintiff established that other similarly situated employees outside of the protected class engaged in conduct the same as, or similar to, that leading to plaintiff's adverse employment action); Dorsey v. Wal-Mart Stores, Inc., 28 F. App'x 468, *2 (6th Cir. 2002)(unpublished table decision)(same); Mitchell, 964 F.2d at 583–84 (same)); *accord* Harrison-Pepper v. Miami Univ., 103 F. App'x 596, 599 (6th Cir. 2004)(recognizing the impropriety of considering a defendant's proffered nondiscriminatory justification for acting as evidence that the plaintiff was not qualified for a position under *the third element*, but finding that in the case before it, the district court did not err in relying on university's proffered reason for disparity between the plaintiff-professor's salary and that of a male professor in deciding whether she had met her burden as to *the fourth element*—whether the university treated her differently from a similarly-situated male counterpart).

defendant's proffered nondiscriminatory reason), *reh'g & suggestion for reh'g en banc denied* (May 4, 2000). Instead, focusing on Ross's lengthy tenure at the Company, the numerous HR certifications she has earned and seminars attended, her eight years' experience as HR manager, and her degree in organizational management, the Court concludes that she has raised a genuine issue of material fact appropriate for jury determination as to whether she was qualified for the position from which she was terminated and/or for which she was replaced. *Cf.* Thompson v. UHHS Richmond Heights Hosp., Inc., 372 F. App'x 620, 624 (6th Cir. 2010)(finding that plaintiff had shown a genuine dispute as to whether she was qualified for position of food-production supervisor, from which hospital-employer fired her, and a chef position, to which it did not transfer her, by showing she was certified, had completed relevant courses, had received on-the-job training, and had over twenty years of experience at the hospital).

FRS asserts that it terminated Plaintiff because it was unhappy with her performance, the responsibilities of the HR manager in Lexington were changing, and it did not believe she was capable of assuming the expanded duties. (Mem. in Supp. of Def.'s Mot. for Summ. J. 24, D.E. 43-8.) In Ross's February 2011 performance review, Parys documented numerous concerns about her job performance, including, among other things, her shortcomings in scheduling events, filling positions, managing her time, delegating tasks, and meeting safety goals. Parys testified at his deposition that these inadequacies remained at the time he and others were contemplating restructuring the Lexington HR manager role and he believed it was important not only to improve the performance of that position but also to find someone who could handle the greater responsibilities of the position as expanded. When the Company ultimately offered the position to Good, it specified that he would be required to oversee multiple facilities and assume certain company-wide duties. These proffered reasons for discharging Plaintiff satisfy FRS's

burden of presenting a legitimate, nondiscriminatory reason for its action. *Cf.* Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1116 (6th Cir. 2001)(holding that performance evaluations concluding plaintiff "needs improvement" were sufficient evidence of unsatisfactory job performance).

Ross now must "point out evidence from which a jury could reasonably reject [Defendant's] explanation as pretextual." Rachells v. Cingular Wireless Emp. Servs., LLC, 732 F.3d 652, 661 (6th Cir. 2013), *reh'g & reh'g en banc denied* (Nov. 22, 2013). She may do so by making any of three interrelated showings: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action ." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012). These categories, however, are nothing "more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" Id. (internal quotation marks omitted). "Whichever method the plaintiff employs, [she] always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 285 (6th Cir. 2012). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional" discrimination. Tingle, 692 F.3d at 530.

Ross argues that FRS's stated reasons were false and "could not have motivated a termination." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 21, D.E. 65.) She points to what she says has been Defendant's "shifting reasoning" for her discharge. (Id.) Upon review, however, it is clear that what she characterizes as shifting reasons are in fact merely variations on the same basic position held by the Company: that the HR manager role at the Lexington facility was

being restructured such that the person in that position would assume, in addition to existing responsibilities, various company-wide and multi-plant HR tasks and that, based on its dissatisfaction with Ross's job performance, Defendant did not believe she could perform in this expanded capacity.  (*See* id. at 15.)  Plaintiff contests the validity of FRS's explanation for its actions, however.  With regard to her job performance, she disputes Parys's position that she "did not make safety a priority," was disorganized, and encountered limitations in performing her job due to her "lack of self-confidence" and the "makeup of her personality," and that several employees had raised complaints regarding her handling of benefits claims. (See id. at 16.)  As to safety, she relies on the deposition testimony of managers who dealt with safety matters stating that they knew of no atypical "safety problems" at FRS Lexington as well as Good's testimony that in 2011 and 2012 the Lexington plant saw a record-low number of injuries and that on balance for the past several years the number of injuries there was comparable to other facilities its size.  (Id.)  With respect to her alleged disorganization, she cites to Corley's testimony as evidence that this was an issue beyond her control because she needed but did not have a "filing clerk" to assist her in maintaining and organizing the training records of all 350+ employees and that, alternatively, the fact that the Company's corporate CFO sent her a "commendation letter" and bonus check in November 2009 rewarding her work in implementing a new computer system demonstrates that she was not in fact disorganized.  (Id.)  She contends that to the extent employees did raise benefits-related complaints during her time as HR manager, this was not attributable to her because, as Parys admitted, the complained-of issues "may not have been . . . within her control."  (Id.)  Finally, she attempts to undermine his conclusion that she lacked self-confidence by relying on her own testimony that she is "a strong woman" who "voice[s her] opinion" and by pointing to the fact that she stood up against discriminatory acts.  (Id.)

To establish pretext, however, Ross "must allege more than a dispute over the facts upon which" Defendant rested its assessment that her job performance was unsatisfactory. Braithwaite v. Timken Co., 258 F.3d 488, 493–94 (6th Cir. 2001). Under the "honest belief" rule adopted by this Circuit, "so long as an employer honestly believed in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be mistaken or incorrect." Kurincic v. Stein, Inc., 30 F. App'x 420, 425 (6th Cir. 2002). "The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." Thomas v. Kmart Corp., Civ. Action No. 4:04CV–171–M, 2006 WL 2802266, at *9 (W.D. Ky. Sept. 28, 2006)(quoting Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996)). "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Id. (emphasis in original)(quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)). This is true whether the plaintiff is male or female. "The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of his or her membership in a protected class and treated less favorably than those outside the class, not whether the plaintiff was treated less favorably than someone's general standard of equitable treatment." Willis v. Valley Residential Servs., No. 06–13686–BC, 2008 WL 1820892, at *5 (E.D. Mich. Apr. 22, 2008)(internal quotation marks omitted)(citing Batts v. NLT Corp., 844 F.2d 331, 337 (6th Cir. 1988)).

In this case, even if Parys and ultimately Laisure were wrong in their assessment that Plaintiff's job performance was deficient, there has simply been no evidence presented from which a reasonable jury could infer that they did not honestly and in good faith believe the

inadequacies existed. Although Ross raises factual objections to Defendant's job-performance concerns, "she cannot defeat [its] honest belief in her performance deficiencies simply through her own contrary assertions." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 599 (6th Cir. 2007)(citing Majewski, 274 F.3d at 1117), cert. denied, 552 U.S. 1258, 128 S. Ct. 1657, 170 L. Ed. 2d 355 (2008). Consequently, her own testimony as to her inner "strength" and the nature of her personality does not suffice to discredit Parys's honest belief that she lacked self-confidence. Additionally, the testimonies of Good and other managers upon which she relies concerning safety do not call into question the veracity of Parys's assessment that she failed to meet safety goals because he testified that his conclusion was based on comparing FRS Lexington to facilities he had previously managed. (Parys Dep. 125:7–25, D.E. 43-2.) Furthermore, as Ross's performance review reveals, the safety-related objectives Parys wanted her to achieve related not merely to the number of injuries, but to the Company's "approach" to safety, its "training and communications," and its "accident investigation and corrective actions." (See Ross Performance Appraisal, D.E. 43-1 at 77.) As to her argument purportedly derived from Corley's deposition testimony—that to the extent she was disorganized it was due to the fact that she lacked adequate personnel to manage the filing of voluminous training records—this must be rejected as it is a mischaracterization of Corley's testimony,[8] and she has no other

---

[8] Ross asserts that at his deposition Corley "stated that if Ms. Ross had been allowed to have a filing clerk to help with clerical matters, there would have been no problem with the organization of the HR Department." (See Pl.'s Mem. in Opp'n to Mot. for Summ. J. 16, D.E. 65.) His testimony, however, was in pertinent part as follows:

> Q: So there needed to be filing done? Somebody needed to help organize and keep the records? Is that your opinion?
> A: My opinion is [employees' training records] needed to have been filed and organized.
> Q: Okay. That helps me to get down to the nitty-gritty of what the problem was. How many employees are at FRS? More than a hundred?
> A: Yes, ma'am.
> . . . .
> Q: More than 300?

evidence to support this contention. Finally, the fact that some of the benefits-related issues about which employees raised complaints under her watch might have been outside her control is insignificant because still others presumably were within her domain. Regardless, this was but one of many deficiencies that Parys claimed to have observed in her job performance.

Plaintiff also fails in her attempt to cast doubt upon FRS's explanation that the Lexington HR manager role was being expanded to include company-wide and multi-facility responsibilities not previously assigned to that position. While she contends that she too was engaged in "multi-plant" tasks while nominally serving as the Lexington HR manager, there is no indication that she performed any *company-wide* functions nor that to the extent she completed some multi-plant duties, they rose to the level of requiring her to oversee several facilities' HR matters at once. (*See* Ross Personnel File, D.E. 65-16 at 27, 30, 42–43.) There is thus no basis for disbelieving that Defendant hired Good into a restructured HR manager position at Lexington, which required him to assume not only those responsibilities that Ross had been performing in the former role, but also new, additional matters of a more global character.

To the contrary, there is considerable basis in the record for accepting FRS's explanation as to why it decided to discharge Ross. Plaintiff has not rebutted this evidence by demonstrating, for example, that, in terminating her, Defendant "made an error too obvious to be unintentional," *see* Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998). She has simply failed to show Defendant did not have an honest belief that her job performance was deficient and that consequently she was not fit for the expanded role being contemplated for the position. Viewing

---

A: Yes ma'am.
. . . .

Q: . . . . In your opinion would a filing clerk have resolved the problem that you were having with HR?
A: Someone filing would have helped.

(Corley Dep. 74:2–10, 13–14; 75:9–12, D.E. 65-13.)

all the evidence presented in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could not find that Defendant's termination of her employment was a pretext for discrimination based on gender. At bottom, Ross's THRA discrimination claim rests upon nothing more substantial than personal beliefs, conjecture and speculation, which are insufficient to defeat Defendant's motion for summary judgment. *See* Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 724 (6th Cir. 2006)("It is well settled that mere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination."). The claim is DISMISSED.

E. Retaliatory Discharge under the TPPA and Tennessee Common Law

The TPPA, the Tennessee whistle blower statute, provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). In order to establish a prima facie case under the TPPA, a plaintiff must show

> (1) [her] status as an employee of defendant; (2) [her] refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

Hugo v. Millennium Labs., Inc., ___ F.Supp.2d ___, 2014 WL 37659, at *7 (E.D. Tenn. Jan. 6, 2014). Upon finding the necessary prima facie showing, the court is to utilize the McDonnell Douglas burden-shifting analysis. Levan v. Sears, Roebuck & Co., ___ F.Supp.2d ___, 2013 WL 6181815, at *13 (E.D. Tenn. Nov. 25, 2013).

To prove a retaliatory discharge claim under Tennessee common law, "the plaintiff must show (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or

for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy."  Franklin v. Swift Transp. Co., 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006), *appeal denied* (Nov. 20, 2006).  The standard for proving a common-law claim of retaliatory discharge is nearly identical to what is required under the TPPA, with the only major difference being that under the TPPA the whistleblowing must have been the sole reason for the discharge while at common law it need only be a "substantial factor."  Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 537 (Tenn. 2002).

The instances Plaintiff identifies as her "refusals to participate in, or to remain silent about, illegal activities" for purposes of the second element of her TPPA claim and her "exercises of protected rights" under the third prong of common-law retaliatory discharge are coextensive with the alleged protected activities she named in support of her THRA retaliation claim, with the addition of one other activity: after Parys advised Ross that Judith Belew was terminated for excessive absenteeism, she alleges that she "contacted the State Department of Labor for guidance on how to work around this situation" and "carefully instructed Belew on how to apply for [her] federally protected leave."  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. 11–12, 28, D.E. 65.)  And, with only one exception,[9] the same deficiencies that plagued Ross's

---

[9]      The Court's finding which proved fatal in the THRA context that Ross's disregard of Phillips's desire that she not post the line-attendant job opening because Staten might qualify was not based on a reasonable belief that this was unlawful race discrimination, is not pertinent here.  Plaintiff testified that she believed Phillips did not want Staten in the position because he feared she would use a previous worker's compensation injury as an excuse to get out of work.  While worker's compensation status is not protected under the THRA, the TPPA and common-law retaliatory discharge are not so limited.  Nonetheless, Ross cannot proceed with a claim based on her posting of the line-attendant opening because, assuming this took place in mid-2009, she was not terminated for another two and one-half to three years, and she has presented no other evidence of causation.  See Mason v. Seaton, 942 S.W.2d 470, 473 (Tenn. 1997)(stating, in addressing a TPPA claim, that "proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship"); Conatser v. Clarksville Coca–Cola Bottling Co., 920 S.W.2d 646, 648 (Tenn. 1995)(in rejecting common-law retaliatory-discharge claim based on plaintiff's

THRA retaliation claim are similarly fatal to her corresponding assertions under the TPPA and Tennessee common law. Additionally, any claim based on the Belew incident, which occurred in March 2010, fails with regard to causation under either the TPPA or the common law as more than two years passed before Plaintiff was terminated, and she has pointed to no other indices of retaliatory conduct from which it can be inferred that this was the sole or even a contributing cause of her discharge. *See supra* note 9 (citing <u>Mason</u>, 942 S.W.2d at 473; <u>Conatser</u>, 920 S.W.2d at 648).

Thus, for the same essential reasons the Court rejected Plaintiff's retaliation claim under the THRA, FRS's motion for summary judgment as to her retaliation claims under the TPPA and Tennessee common law is GRANTED. *Cf.* <u>Coffman v. Robert J. Young Co.</u>, 871 F. Supp. 2d 703, 718 (M.D. Tenn. 2012)(resolving summary judgment as to the plaintiff's TPPA and common-law retaliation claims on the same bases as her retaliation claim under the ADA).

## IV. CONCLUSION

For the aforementioned reasons, Plaintiff's request that certain portions of Good's affidavit be disregarded is DENIED; Defendant's objection to the admissibility of evidence of other acts of gender discrimination is SUSTAINED; and the Defendant's motion for summary judgment is GRANTED. The Clerk is DIRECTED to enter judgment in favor of the Defendant.

IT IS SO ORDERED this 23rd day of May, 2014.

/s J. DANIEL BREEN_____
CHIEF UNITED STATES DISTRICT JUDGE

---

termination three days after filing a workers' compensation claim, the court found plaintiff could not establish causation by relying solely on temporal proximity).